**Robert G. McCULLOUGH,**
**Appellant–Petitioner,**

v.

**Karen E. McCULLOUGH,**
**Appellee–Respondent.**

No. 53A04–9702–CV–43.

Court of Appeals of Indiana.

Jan. 26, 1999.

**191**

Michael K. Ausbrook, Bloomington, Indiana, for appellant.

Robert W. Beck, Bloomington, Indiana, for appellee.

**OPINION**

**ON PETITION TO DISQUALIFY JUDGE RATLIFF**

STATON, Judge.

Robert McCullough petitions the Court to disqualify Senior Judge Wesley W. Ratliff, Jr., from serving as a judge in the case of *McCullough v. McCullough*, No. 53A04–9702–CV–43. McCullough's petition is filed as a result of this Court's May 12, 1998, memorandum opinion in the above referenced case, which was authored by Judge Ratliff. In addition to disqualifying Judge Ratliff, McCullough requests that we order our opinion sealed and that we resubmit the case to a new panel of judges. McCullough's petition raises five issues, which we restate as:

I.   Whether the Supreme Court possessed statutory authority to appoint Judge Ratliff as a senior judge of the Indiana Court of Appeals.

II.  Whether statutes authorizing the appointment of senior judges to the Indiana Court of Appeals contravene the Indiana Constitution.

III. Whether Judge Ratliff lacked authority to decide this case since he had not been appointed as a senior judge of the Indiana Court of Appeals at the time the Court obtained jurisdiction over the case.

IV. Whether Judge Ratliff held more than one lucrative office in violation of Article II, § 9 of the Indiana Constitution.

V. Whether Judge Ratliff's impartiality might reasonably be questioned due to his appointment as a senior judge of the Monroe Circuit Court, the court from whose decision McCullough appeals.

Because we answer the first issue in the affirmative and the remaining issues in the negative, we deny McCullough's petition.

## I.

### Statutory Authority to Appoint Judge Ratliff

■ On January 7, 1998, the Indiana Supreme Court appointed Judge Ratliff to serve as a senior judge of the Indiana Court of Appeals until the end of 1998. *Order of Appointing Senior Judges to the Indiana Court of Appeals,* 94S00–9801–MS–6 (Ind. Jan. 7, 1998). McCullough argues that, as of January 7, 1998, the Supreme Court did not possess the statutory authority to appoint Judge Ratliff as a senior judge.[1] In support of his argument, McCullough observes that the senior judge statutes, IND.CODE §§ 33–4–8–1 to 33–4–8–5 (1993 & Supp.1997), were recently amended to explicitly state that the Indiana Supreme Court may appoint a senior judge to the Indiana Court of Appeals. *See* P.L. 33–1998, §§ 1–3, 1998 Ind.Acts 794. These amendments were effective July 1, 1998. *Id.* McCullough argues that because these amendments did not take effect until after Judge Ratliff was appointed, the judge's appointment was unauthorized.

Although IC 33–4–8 had not yet been amended, IND.CODE § 33–2.1–5–1 (1993) did exist at the time of Judge Ratliff's appointment. IC 33–2.1–5–1 provides, in relevant part: "The Supreme Court is empowered to authorize retired justices and judges to perform temporary judicial duties in any court of the state." This statute clearly grants our Supreme Court the authority to appoint Judge Ratliff, a retired judge of the Indiana Court of Appeals, to perform temporary judicial duties on behalf of this Court. Referring to Judge Ratliff as a senior judge, although technically incorrect at the time of his appointment, did not affect the validity of his decision in *McCullough* since he had full authority to act as a temporary judge of this Court. Accordingly, we reject McCullough's argument that Judge Ratliff's appointment was not statutorily authorized.

## II.

### Constitutionality of Appointing Senior Judges

■ McCullough contends that, regardless of statutory authorization, the appointment of senior judges to the Indiana Court of Appeals contravenes the Indiana Constitution. Specifically, McCullough argues that only judges who have been appointed as continuing members of one of this Court's five districts and who are subject to retention votes by the electorate may exercise the judicial authority given to the Court of Appeals.

McCullough raises an issue of first impression in Indiana. We have never before addressed the constitutionality of appointing senior judges to perform temporary judicial duties on behalf of the Court of Appeals. In an effort to address this Court's substantial caseload,[2] Chief Judge Sharpnack requested that two former judges of the Court of Appeals, the Honorable Wesley Ratliff, Jr. and the Honorable Jonathan Robertson, be appointed on a temporary basis as senior

---

1. McCullough also argues that the Supreme Court does not possess inherent authority to appoint senior judges to this Court. Because we hold that the Supreme Court has statutory authority, we need not address this issue.

2. The Court received 2071 fully-briefed cases in 1997. COURT OF APPEALS OF INDIANA, 1997 ANNUAL REPORT 1. This is an increase of 292 cases from 1991, the first year of this Court's Fifth District. *See* COURT OF APPEALS OF INDIANA, 1991 PROGRESS REPORT 1; P.L. 158–1990, 1990 Ind.Acts 2156–57.

judges. *See Order of Appointing Senior Judges to the Indiana Court of Appeals*, 94S00–9801–MS–6 (Ind. Jan. 7, 1998).

The Indiana Court of Appeals is a constitutional court, having been first created in 1972 after the voters ratified an amendment to our constitution. *See* IND. CONST. Art. VII, § 1; P.L. 427, § 3, 1971 Ind.Acts 1981–82.[3] Article VII, § 5 describes the composition of the Court of Appeals:

> Section 5. Court of Appeals. The Court of Appeals shall consist of as many geographic districts and sit at such locations as the General Assembly shall determine to be necessary. Each geographic district of the Court shall consist of three judges. The judges of each geographic district shall appoint such personnel as the General Assembly may provide by law.

Acting upon the authority it is given by this provision, the General Assembly has created five geographic districts. IND.CODE § 33–2.1–2–2 (1998). Accordingly, this Court currently consists of fifteen judges. *Id.*

Court of Appeals judges are appointed by the Governor from a list of three nominees presented to him by the Judicial Nominating Commission. IND. CONST. Art. VII, § 10.[4] Article VII, § 11 requires a Court of Appeals judge to face a retention vote in the first general election following the expiration of two years from his appointment, and every ten years thereafter.[5]

Senior Judge Ratliff is not a judge of the Indiana Court of Appeals.[6] He is not a member of one of the three-judge districts established by § 5. Nor is he subject to retention votes by the electorate as provided by § 11. Because Judge Ratliff is not a member of the Court and because he is not subject to a retention vote, McCullough insists that the constitution prohibits him from exercising the judicial authority given the Court of Appeals by Art. VII, § 1. McCullough argues that pursuant to § 5, only a judge appointed to serve as a continuing member of one of the districts may exercise the Court's judicial authority. McCullough also contends that § 11 subjects Court of Appeals judges to minimum political accountability, and accordingly, this Court's judicial authority may not be exercised by an individual who is not subject to a retention vote.

Both § 5 and § 11 are silent regarding senior judges, as is the rest of the Indiana Constitution. The constitution neither explicitly permits nor explicitly prohibits senior judges from performing temporary judicial duties on behalf of the Court of Appeals. McCullough relies on this silence in the constitution to support his argument that the Court of Appeals may not utilize senior judges. How, in fact, should this constitutional silence be interpreted?

In *Schmitt v. F.W. Cook Brewing Co.*, 187 Ind. 623, 120 N.E. 19 (1918), our Supreme Court described the purpose of our constitution:

> It is fundamental that a state Constitution is a limit of power. It simply divides sovereign power of the people in the state into the several departments of government and all power inheres in the people, and they possess all of it except that which is granted to the United States by the federal Constitution, and *they may pass any law which is not in violation of the limitations in the state Constitution and*

3. Article VII, § 1 provides: "The judicial power of the State shall be vested in one Supreme Court, one Court of Appeals, Circuit Courts, and such other courts as the General Assembly may establish."

4. Art. VII, § 10 provides, in relevant part: "A vacancy in a judicial office in the Supreme Court or Court of Appeals shall be filled by the Governor, without regard to political affiliation, from a list of three nominees presented to him by the judicial nominating commission. . . ."

5. Art. VII, § 11 provides, in relevant part:

> A justice of the Supreme Court or Judge of the Court of Appeals shall serve until the next general election following the expiration of two years from the date of appointment, and subject to approval or rejection by the electorate, shall continue to serve for terms of ten years, so long as he retains his office. . . . In the case of judges of the Court of Appeals the electorate of the geographic district in which he serves shall vote on the question of approval or rejection.

6. Judge Ratliff was a judge of the First District of this Court until his retirement in 1992.

*not in violation of parts of the federal Constitution applicable to the states.*

*Id.* at 20 (emphasis added). The Indiana Supreme Court has held on many occasions that the General Assembly may enact any law, so long as it does not conflict with the Indiana or federal Constitutions. *See, e.g. Hanley v. State,* 234 Ind. 326, 123 N.E.2d 452, 454 (1954); *State v. Shumaker,* 200 Ind. 716, 164 N.E. 408, 409 (1928); *State v. Wiggam,* 187 Ind. 159, 118 N.E. 684, 684 (1918). Like the constitutions of all states, Indiana's constitution serves a different role than that of the federal constitution. State constitutions serve as limitations on the power of states to make law, whereas the federal constitution is a grant of enumerated powers, upon which all exercises of federal power must be based. 16 C.J.S. *Constitutional Law* §§ 53–54, 58 (1984); ADVISORY COMMISSION ON INTERGOVERNMENTAL RELATIONS, STATE CONSTITUTIONAL LAW: CASES AND MATERIALS 2 (1988).

Given our constitution's function as a limitation on the General Assembly's legislative power, and not a grant of power, the constitution's silence regarding senior judges weighs in favor of the conclusion that the legislature may authorize this Court to utilize senior judges. We must determine only whether the Indiana Constitution impliedly prohibits senior judges from temporarily exercising the judicial authority vested in the Court of Appeals.

Article VII, § 5 describes the composition of the Court of Appeals, providing that the Court consists of as many three-judge districts as the General Assembly deems necessary. McCullough suggests that this description of the Court's composition necessarily prohibits anyone other than continuing members of the Court's districts from exercising the Court's judicial authority. It does not.

7. IC 33–4–8–1(b) provides: "A superior court, a county court, a probate court, or the court of appeals may apply to the supreme court for the appointment of a senior judge to serve the court."

8. Judge Ratliff's appointment at the time this case was decided was authorized by IC 33–2.1–5–1. *See, supra* section I. Although that statute

Article VII, § 1 creates the Court of Appeals. Article VII, § 5 provides that the Court shall consist of three-judge districts. The judges of these districts are the Court, and they are empowered to exercise the entire breadth of the Court's judicial authority. Furthermore, because only these district judges are empowered by the constitution to exercise the Court of Appeals' authority, it is implicit in the constitution that the district judges may not be deprived of any part of the Court's authority. Any legislative enactment that had the effect of diminishing the power of the constitutional judges of this Court would be unconstitutional.

By enacting the senior judge statutes, *see* IND.CODE §§ 33–4–8–1 to IC 33–4–8–5 (1998), the General Assembly has authorized the constitutional judges of this Court to request the assistance of retired judges in the performance of the Court of Appeals' judicial work.[7] Neither § 1 nor § 5 prohibits this legislation because it does not impair the authority of the constitutional judges over this Court. Although senior judges are permitted by statute and are appointed by the Supreme Court, they serve only at the request of the Chief Judge of the Court of Appeals. *See Order of Appointing Senior Judges to the Indiana Court of Appeals,* 94S00–9801–MS–6 (Ind. Jan. 7, 1998); IC 33–4–8–1 and 33–4–8–2.[8] Thus, senior judges exercise the judicial authority of the Court of Appeals only with the approval of this Court's constitutional judges. Because senior judges are subject to this control, their use is not prohibited by § 5.

■ Next, McCullough argues that the Court's judicial authority may not be exercised by individuals who are not subject to the political accountability provided by Article VII, § 11. Section 11 requires Court of Appeals judges to face retention votes in the first general election following the expiration

does not require that the Court of Appeals request a senior judge prior to his appointment, the Supreme Court, in appointing Judge Ratliff, acted at this Court's request. *See Order of Appointing Senior Judges to the Indiana Court of Appeals,* 94S00–9801–MS–6 (Ind. Jan. 7, 1998). Accordingly, the statute, as applied, is not unconstitutional.

of two years from the date of their appointments, and every ten years thereafter. Thus, the tenure of Court of Appeals judges is dependent, in part, upon the will of the electorate. Since Judge Ratliff is not subject to the possibility of being removed from office by the voters, McCullough argues that the constitution implicitly prohibits him from performing judicial duties on behalf of the Court.

McCullough's argument is founded, at least in part, on the idea that Court of Appeals judges derive their authority in some measure from the electorate. They do not. Court of Appeals judges are not elected; they are appointed. IND. CONST. Art. VII, § 10. Thus, the voters do not get to choose Court of Appeals judges. Section 11 provides the voters with the power to remove a Court of Appeals judge, but this is only one of several procedures the constitution employs for the involuntary removal or retirement of Court of Appeals judges.[9] Moreover, a judge of the Court does not face a retention vote until he has been a judge for at least two years, yet it cannot be said that he does not validly exercise the Court's authority during that initial two-year period.

It might be argued that the prospect of a retention vote affects the manner in which a judge, who wishes to remain a judge, exercises the Court's authority. However, the political accountability that this places on a judge is indirect, and the same indirect pressures apply to the actions of a senior judge. A senior judge acts only at the request of the constitutional judges of the Court, who may take away a senior judge's authority to act at any time. See Order of Appointing Senior Judges to the Indiana Court of Appeals, 94S00–9801–MS–6 (Ind. Jan. 7, 1998) ("Senior Judges Robertson and Ratliff shall serve on call of the Chief Judge"). Too, since the constitutional judges are ultimately responsible for the senior judge's actions, the electorate may disapprove of the senior judge's performance by refusing to retain the constitutional judges responsible for his appointment. Finally, this argument does not account for the not infrequent situation where a judge of the Court will knowingly retire, either voluntarily or involuntarily, prior to his next retention vote.[10] Since that judge will not face another retention vote, his judicial decisions will be unaffected by § 11. Thus, we conclude that § 11 does not prohibit this Court from utilizing senior judges.

■ Finally, we observe that the use of senior judges is consistent with the Court of Appeals' role in the judicial structure established by our constitution. A brief review of the history of Indiana's intermediate appellate court reveals that role.

Neither of Indiana's constitutions, adopted in 1816 and 1851, created an intermediate appellate court. Judge Robert H. Staton, *The History of the Court of Appeals of Indiana*, 30 IND.L.REV. 203, 205–06 (1997). Thus, the Indiana Supreme Court was originally the sole appellate court in Indiana. Throughout much of its early history, the Supreme Court struggled with an overburdened docket. See 1 LEANDER J. MONKS, COURTS AND LAWYERS OF INDIANA 181, 258, 270, 298–300, 362; Staton, *supra* at 205–08. At times, litigants had to wait as long as two or three years to receive a decision. *Id.* Finally, in 1891, the General Assembly acted to relieve the Supreme Court's docket by creating the Appellate Court of Indiana. Act of Feb. 28, 1891, ch. 37, §§ 1–27, 1891 Ind. Acts 39. Although initially the Appellate Court was intended to be temporary, it was made permanent in 1901. Act of Mar. 12, 1901, ch. 247, § 19, 1901 Ind.Acts 565, 570 (superseded).

This history establishes that the Appellate Court was intended to provide litigants with speedier justice while relieving the Supreme Court's docket. When the Indiana Court of

9. Art. VII, § 11 requires the Supreme Court to remove a Court of Appeals judge from office when his conviction for a felony or "any other crime that involves moral turpitude under the law" becomes final. Section 11 also provides that a Court of Appeals judge may be, under certain circumstances, removed for misconduct or retired when disabled.

10. Article VII, § 11 requires Court of Appeals judges to "retire at the age specified by statute in effect at the commencement of his current term." IC 33–2.1–5–1 requires a Court of Appeals judge to retire at the age of seventy-five.

Appeals replaced the Appellate Court in 1972, the framers of the constitution envisioned a continuation of that purpose. In commenting on Art. VII, § 5, the Judicial Study Commission stated: "It is anticipated that the three judges of each geographic district of the Court of Appeals will dispose of the vast majority of appeals with the Supreme Court granting transfer or certiorari only in novel, extraordinary, or important cases...." JUDICIAL STUDY COMMISSION, 1972 JUDICIAL ARTICLE OF THE INDIANA CONSTITUTION AND PROPOSED IMPLEMENTING LEGISLATION 6 (1970).

Unfortunately, as the case load of our Court continues to grow, *see, supra* note 2, it becomes increasingly difficult to provide speedy justice without expanding the size of the Court. Pursuant to Art. VII, § 5, the only way to expand the Court is to add districts, consisting of three judges. The cost of adding a three-judge district is high.[11] Utilizing the talent and experience of senior judges on a temporary basis is less expensive[12] and provides greater flexibility, since senior judges serve only when needed by the Court. Senior judges provide a cost-effective means for this Court to achieve its constitutional purpose. We hold that the Indiana Constitution does not prohibit the appointment of senior judges to perform temporary judicial duties on behalf of the Indiana Court of Appeals.

### III.

#### *Jurisdiction*

McCullough argues that Judge Ratliff lacked the authority to decide this case because he had not been appointed as a senior judge at the time the Court of Appeals obtained jurisdiction over the case. The Court of Appeals obtained jurisdiction on February 18, 1997, the date the record of proceedings was filed. *See* Ind. Appellate Rule 3(A). Senior Judge Ratliff was appointed on January 7, 1998. *Order of Appointing Senior Judges to the Indiana Court of Appeals,* 94S00–9801–MS–6 (Ind. Jan. 7, 1998)

██ McCullough's argument is without merit. The Indiana Supreme Court has held that the jurisdiction of the Court of Appeals lies in the Court as a whole, not the individual judges or districts thereof. *State ex rel. Shortridge v. Court of Appeals of Indiana,* 468 N.E.2d 214, 216 (Ind.1984). When a particular judge obtains the authority to exercise the Court's judicial power is not relevant, so long as the judge possesses the authority at the time he acts. Judge Ratliff possessed that authority on May 12, 1998, the date of his opinion in this case; therefore, he was authorized to issue his opinion.

### IV.

#### *Two Lucrative Offices*

McCullough argues that Judge Ratliff should be disqualified from this case because he simultaneously held two lucrative offices in violation of Article II, § 9 of the Indiana Constitution. Art. II, § 9 provides, in part: "... no person may hold more than one lucrative office at the same time, except as expressly permitted in this Constitution." Judge Ratliff was appointed a senior judge of the Court of Appeals on January 7, 1998. *See Order of Appointing Senior Judges to the Indiana Court of Appeals,* 94S00–9801–MS–6 (Ind. Jan. 7, 1998). Judge Ratliff's appointment as a senior judge of several trial courts, including the Monroe Circuit Court, was extended on March 1, 1998. *See Order Extending Appointment of Senior Judges,* 94S00–9712–MS–691 (Ind. Feb. 26, 1998). McCullough argues that by accepting this extension of his appointment as a trial court senior judge, Judge Ratliff vacated his appointment as an appellate court senior judge by operation of law. Thus, McCullough argues that Judge Ratliff was without authority to serve as a senior judge of the Court of Appeals on May 12, 1998, the date the opinion in this case was handed down.

██ "A 'lucrative office' is defined as 'an office to which there is attached a compensation for services rendered.'" *Gaskin v. Bei-*

---

11. The annual cost of adding a district, in salary and benefits alone, would exceed one million dollars.

12. Senior judges receive $50 per diem and reimbursement of expenses. IC 33–4–8–5.

*er*, 622 N.E.2d 524, 528 (Ind.Ct.App.1993) (quoting *Book v. State Office Building Comm.*, 238 Ind. 120, 149 N.E.2d 273, 289 (1958)). We have defined an office, as that term is used by Art. II, § 9, as: "... a position for which *the duties* include the performance of some sovereign power for the public's benefit, are *continuing*, and are created by law instead of contract." *Gaskin*, 622 N.E.2d at 528 (emphasis added).

 Certain attributes of Judge Ratliff's duties are in the nature of an office. He exercises sovereign power as a senior judge and his duties are created by law, not contract. However, Judge Ratliff's duties as a senior judge of the Court of Appeals and the trial courts are not continuing. Judge Ratliff serves at the call of judges of those courts, and he has no authority whatsoever without the consent of the regular judges. Moreover, Judge Ratliff may not be compensated as a senior judge for more than one hundred days per calendar year. *See* IC 33–4–8–5. It is clear that Judge Ratliff's duties are not continuing. Judge Ratliff does not hold an office as that term is meant by Art. II, § 9, and his service as a senior judge on this Court does not violate Art. II, § 9.

### V.

#### *Impartiality*

Finally, McCullough argues that Judge Ratliff should have disqualified himself from participating in this case because his impartiality might reasonably be questioned. Canon 3(E)(1) of the Code of Judicial Conduct requires a judge to disqualify himself in a proceeding in which the judge's impartiality might reasonably be questioned. McCullough's appeal was from a decision of the Monroe Circuit Court. Judge Ratliff was appointed as a senior judge of the Monroe Circuit Court at the time he issued his opinion in this case.

McCullough contends that Judge Ratliff's affiliation with the Monroe Circuit Court reflects on his impartiality. First, McCullough observes that the regular judges of the Monroe Circuit Court are responsible for appointing Judge Ratliff as a senior judge and that Judge Ratliff has a pecuniary interest in being appointed by those judges.[13] Thus, McCullough suggests that Judge Ratliff's interest in being appointed by those judges raises a reasonable question regarding his impartiality in reviewing their decisions on appeal.

A judge's recusal is required where the judge has a direct pecuniary interest in the case to be heard. *Councell v. Stafford*, 626 N.E.2d 577, 579 (Ind.Ct.App.1993), *trans. denied.* However, disqualification is unnecessary where the judge's interest is indirect. *Id.* We do not agree that Judge Ratliff's impartiality might reasonably be questioned under the facts of this case. To the extent that Judge Ratliff has any pecuniary interest, that interest would be extraordinarily indirect. Thus, disqualification was not required.

McCullough also argues that Judge Ratliff has an interest in protecting the prestige of the Monroe Circuit Court by affirming its judgments on appeal. We do not believe that Judge Ratliff has any more interest in protecting the prestige of the Monroe Circuit Court than he does for any other trial court in the state. McCullough's argument, taken to its logical extent, would require all Court of Appeals judges, who were formerly trial court judges, to recuse themselves from cases being appealed from their former court. Such action is neither necessary nor desirable. Thus, we reject McCullough's argument.

Petition denied.

KIRSCH, J., and ROBB, J., concur.

---

**13.** Senior judges receive $50 per diem. IC 33–4–8–5.

William WILCOXEN, Appellant–
Petitioner,

v.

STATE of Indiana, Appellee–Respondent.

No. 10A01–9804–PC–160.

Court of Appeals of Indiana.

Jan. 26, 1999.

Transfer Denied March 16, 1999.

See also, 619 N.E.2d 574.

Susan K. Carpenter, Public Defender of Indiana, Richard Denning, Deputy Public Defender, Indianapolis, Indiana, for appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Thomas D. Perkins, Deputy Attorney General, Indianapolis, Indiana, for appellee.

## OPINION

ROBB, Judge.

William Wilcoxen appeals the denial of his petition for post-conviction relief challenging his conviction of Murder and the resulting sentence of sixty years. We affirm.

*Issues*

Wilcoxen presents for our review the following restated issues:

1. Whether it was fundamental error to instruct the jury that "sudden heat" is an

element of the offense of voluntary manslaughter; and

2. Whether he was denied the effective assistance of counsel when trial counsel tendered the erroneous instruction to the trial court and appellate counsel failed to raise the issue of the erroneous instruction or trial counsel's ineffectiveness on direct appeal.

### Facts and Procedural History

The facts, as set forth by our supreme court in Wilcoxen's direct appeal, are as follows:

On the evening of January 12, 1991, and the early morning hours of January 13, appellant and some of his friends toured several bars in Clark County. In Bill's Lounge, also known as River Falls Lounge, appellant came in contact with Kathy Chism Shetler, the victim in this case, David Shetler, the husband of the victim, David's aunt, Doris Hall, and her two daughters. The victim's companions, with the exception of the aunt, all left, including her husband.

After the husband left, appellant approached the victim and the aunt and asked them to dance, which both women did. When the bartender gave the "last call" prior to closing, the victim's aunt went to warm up her car, and the victim told her to wait for her. However, after the aunt waited for quite some time and the victim had not appeared, the aunt left. The victim's friend, Regina Thompson, testified that she saw the victim and appellant walking down the street from the bar toward the Ohio River. A few minutes later she saw them together on an overlook by the river.

In his statement to police, appellant told them he walked to the river with the victim. When they decided to go under the overlook he preceded the victim, and when he turned around under the overlook, he observed her approaching him with a knife. He said he managed to wrest the knife from her and throw it away. He then beat the victim and ran from the scene.

Prior to giving the statement to the police, appellant had told his friend, Kenneth Thompson, and his roommate that he and the victim had gone under the overlook to have sex. When each of them had partially removed their clothing, she pulled a knife and demanded his wallet. He said he grabbed the knife, threw it toward the river, then grabbed "sticks and stuff" and started hitting her. He said he "just went nuts."

After hearing appellant's story, his roommate and Thompson drove to the scene to find the victim; however, they were unsuccessful. They returned to the house and told appellant they had not found the victim. Appellant then returned to the scene with the two men and the victim's body was found. The men went to a telephone booth, called the police, and waited at the scene for the police to arrive. Appellant was taken to the police station and after being questioned, a breathalyzer test which was administered at approximately 8:30 a.m. showed an .08% blood alcohol content.

*Wilcoxen v. State*, 619 N.E.2d 574, 575 (Ind. 1993). Additional facts relevant to this appeal will be supplied as necessary.

Wilcoxen was tried by a jury and convicted of Murder. He received an enhanced sentence of sixty years. On direct appeal, our supreme court affirmed his conviction and sentence. *Id.* at 577.

In 1994, Wilcoxen filed a *pro se* petition for post-conviction relief, which was amended by counsel in 1997. Wilcoxen asserted that the trial court committed fundamental error in instructing the jury that sudden heat is an element of the lesser-included offense of voluntary manslaughter. Wilcoxen also asserted that his trial counsel was ineffective for tendering the erroneous instruction, and that his appellate counsel was ineffective for failing to raise these issues on direct appeal. The post-conviction court denied the petition, making the following relevant conclusions of law:

1. [Wilcoxen] contends that Instruction No. 12 tendered by his trial counsel resulted in the jury being improperly instructed on the lesser included offense of voluntary manslaughter. He argues that the in-

struction was erroneous because it stated that sudden heat is an element of the offense.

. . .

3. This court concurs with the post conviction counsel that Instruction No. 12 is incorrect. Sudden heat is not an element of the offense of voluntary manslaughter. *Palmer v. State (Palmer II)*, 573 N.E.2d 880 (Ind.1991), *Bane [v. State*, 587 N.E.2d 97, 100 (Ind.1992) ]. Rather, sudden heat is a mitigating factor which reduces what would otherwise be murder to voluntary manslaughter. I.C. 35–42–1–3(b).

4. Our supreme court did hold in *Palmer II* that failure to object to an instruction stating that sudden heat was an element of voluntary manslaughter constituted ineffective assistance of counsel sufficient to grant post conviction relief. *Id.* at 880. However, that instruction also incorrectly included lack of malice as an element. Such is not the case in this proceeding.

5. The jury instruction in the *Bane* case "at one point suggested to the jury that sudden heat was an element of the crime on [sic] voluntary manslaughter. At another point, it cited the voluntary manslaughter statute and informed the jury that sudden heat was a mitigating factor.["] *Id.* at 100–01. The Supreme Court held that the instruction did not constitute fundamental error as it did not deprive *Bane* of his due process rights. *Id.* at 101. The Court also stated that an error in the wording of a voluntary manslaughter instruction may be cured by other instructions given simultaneously to the jury. *Id.* at 101.

. . .

9. While the jury was not expressly instructed using the words "mitigator" or "mitigating factor", it was not misled. Instruction No. 5 specified that voluntary manslaughter was a lesser included offense. Instruction No. 10 discusses what is necessary "in order for a killing to be *reduced to* voluntary manslaughter". Instruction No. 11 discussing provocation and sudden heat states, "[A]ll that is required to *reduce* a homicide from murder

to voluntary manslaughter is sufficient provocation to excite in the mind of the Defendant such emotions as anger, rage, sudden resentment, or terror as may be sufficient to obscure the reason of an ordinary person, and to prevent deliberation and premeditation, to exclude malice, and to render the Defendant incapable of cool reflection." Nor was the jury confused as to the burden of proof. By Instruction No. 1, the jury was advised as to the presumption of innocence, and that he was "not required to present any evidence to prove his innocence or to explain anything." They were again so advised by the Court's Instruction No. 7. Any error in the wording of Instruction No. 12 was cured by the foregoing and other instructions given simultaneously to the jury. Thus, while Instruction No. 12 was technically erroneous, the instruction does not constitute fundamental error, and [Wilcoxen's] claims that his trial counsel provided ineffective assistance of counsel are without merit.

P–C.R.R. 74–77. Wilcoxen now appeals the denial of his petition for post-conviction relief.

### Discussion and Decision

#### A. Standard of Review

▇ The purpose of a petition for post-conviction relief is to provide a means for raising issues unknown or unavailable to a defendant at the time of the original trial and appeal. *Carrington v. State*, 678 N.E.2d 1143, 1146 (Ind.Ct.App.1997), *trans. denied* . Post-conviction procedures are reserved for subsequent collateral challenges and may not provide a "super appeal" for the convicted. *Weatherford v. State*, 619 N.E.2d 915, 916 (Ind.1993). When the petitioner has already been afforded the benefit of a direct appeal, post-conviction relief contemplates a rather small window for further review. *Montano v. State*, 649 N.E.2d 1053, 1056 (Ind.Ct.App. 1995), *trans. denied.* Thus, in general, if an issue was available on direct appeal but not advanced, it is deemed waived for post-conviction review. *Madden v. State*, 656 N.E.2d 524, 526 (Ind.Ct.App.1995), *trans. denied.* But see *Woods v. State*, 701 N.E.2d 1208, 1220 (Ind.1998) (holding that "a Sixth

Amendment claim of ineffective assistance of trial counsel, if not raised on direct appeal, may be presented in postconviction proceedings.").

■ There is a "fundamental error" exception to the general rule of waiver which is available only when the record reveals clearly blatant violations of basic and elementary due process and when the harm or potential for harm cannot be denied. *Minnick v. State*, 698 N.E.2d 745, 759 (Ind.1998). Application of this exception in post-conviction proceedings is generally limited to instances of deprivation of Sixth Amendment right to counsel or to an issue demonstrably unavailable to the petitioner in the prior proceedings. *Id.* In the instant case, where the error in the voluntary manslaughter instruction was not brought as an issue on direct appeal, we will only reverse based upon the instruction if we find it to be fundamental error.

■ The petitioner must establish his grounds for relief by a preponderance of the evidence. Ind. Post–Conviction Rule 1(5). On appeal from the denial of a petition for post-conviction relief, we neither reweigh the evidence nor judge the credibility of the witnesses. *Montano*, 649 N.E.2d at 1056. To prevail on appeal from the denial of a petition for post-conviction relief, the petitioner must show that the evidence is without conflict and leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind.1995). It is only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion, that the decision will be disturbed as being contrary to law. *Id.* at 1120.

B. Voluntary Manslaughter Instruction

■ Wilcoxen contends that the trial court committed fundamental error in instructing the jury that sudden heat is an element of voluntary manslaughter which the State was required to prove beyond a reasonable doubt. The jury was instructed as follows:

## INSTRUCTION NO. 10 VOLUNTARY MANSLAUGHTER

*In order for a killing which would otherwise be murder to be reduced to voluntary manslaughter,* the killing must have been upon a sudden heat of passion, caused by sufficient provocation upon the part of the one killed, and the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool, and there must have been a causal connection between the provocation, the passion and the fatal act.

The law does not recognize the use of words alone as sufficient provocation *to reduce the offense from murder to manslaughter,* the other essential elements of murder being present.

. . .

If death, though knowingly and intentionally caused, appears to have been inflicted immediately after provocation deemed by the law adequate to excite sudden and angry passions in the mind of persons ordinarily constituted, and before sufficient time elapses for deliberation and for the passions to cool, *then this fact reduces the offense from murder to manslaughter.* The killing is still unlawful, however, because a person is bound to curb his passions, and the offense, if all other essential elements exist, is voluntary manslaughter.

## INSTRUCTION NO. 11 VOLUNTARY MANSLAUGHTER

### Provocation/Sudden Heat

*All that is required to reduce a homicide from murder to voluntary manslaughter* is sufficient provocation to excite in the mind of the Defendant such emotions as anger, rage, sudden resentment, or terror as may be sufficient to obscure the reason of an ordinary person, and to prevent deliberation and premeditation, to exclude malice, and to render the Defendant incapable of cool reflection.

## INSTRUCTION NO. 12 LESSER INCLUDED OFFENSES— ELEMENTS

The Defendant is charged with Murder. Voluntary Manslaughter is a lesser includ-

ed offense of Murder. The elements of Voluntary Manslaughter are:

The Defendant

1. knowingly or intentionally

2. killed

3. Kathy Chism Shelter

4. while acting under sudden heat.

If you find the State did prove each and every one of these elements beyond a reasonable doubt, you should return a verdict of guilty of voluntary manslaughter, Class B felony. . . .

R. 290–93 (emphasis added).

■■■■ At the time of Wilcoxen's trial, it was already well-settled that sudden heat is not an element of voluntary manslaughter. *See Palmer v. State*, 553 N.E.2d 1256, 1259 (Ind.Ct.App.1990), *aff'd on reh'g*, 573 N.E.2d 880 (Ind.1991). "The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . . to voluntary manslaughter." Ind.Code § 35–42–1–3(b). Where there is evidence of sudden heat, the burden is on the State to *negate* its existence beyond a reasonable doubt. *Clark v. State*, 668 N.E.2d 1206, 1209 (Ind.1996), *cert. denied*, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997).

Courts of this state have had several opportunities to address the issue of whether a voluntary manslaughter instruction which includes sudden heat as an element of the offense constitutes fundamental error. *See id., Isom v. State*, 651 N.E.2d 1151 (Ind. 1995); *Bane v. State*, 587 N.E.2d 97 (Ind. 1992); *Palmer v. State*, 553 N.E.2d 1256 (Ind.Ct.App.1990).

In *Palmer*, a panel of this court held that an instruction informing the jury that sudden heat is an element of the offense of voluntary manslaughter was fundamental error and that the defendant's counsel was ineffective for failing to object to the instruction or tender a correct instruction. 553 N.E.2d

1256, 1259–60 (Ind.Ct.App.1990). The erroneous instruction stated:

## VOLUNTARY MANSLAUGHTER

"A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a class B felony."

The essential elements of this crime are:

1. The voluntary killing of a human being

2. Without malice, and

3. In sudden heat.

Sudden heat as used herein means an access [sic] of rage or anger suddenly arising from a contemporary provocation occurring at the time of the killing.

*Id.* at 1258. This instruction was erroneous in three ways: (1) it included the absence of malice as an element of voluntary manslaughter; (2) it included the presence of sudden heat as an element of voluntary manslaughter;· and (3) it wholly failed to inform the jury that sudden heat was a mitigating factor which the State was required to *disprove* beyond a reasonable doubt. *Id.* at 1260–61. The court of appeals reversed the denial of Palmer's petition for post-conviction relief. *Id.* at 1261. The supreme court affirmed the court of appeals on rehearing. *Palmer v. State*, 573 N.E.2d 880, 880 (Ind. 1991).

Several subsequent decisions, however, have held that a jury instruction incorrectly including sudden heat as an element of voluntary manslaughter is not fundamental error if the instruction also explains that sudden heat is a mitigating factor. *Clark*, 668 N.E.2d at 1209; *Isom*, 651 N.E.2d at 1153; *Bane*, 587 N.E.2d at 101. In each case, the instruction included sudden heat as an element of the offense, but also informed the jury that sudden heat is a mitigating factor that reduces murder to voluntary manslaughter.[1] As stated in *Bane*:

Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.'
The existence of sudden heat is a mitigating factor that reduces what otherwise would be Murder to Voluntary Manslaughter.

1. The instruction in *Clark* read in pertinent part:
The crime of Voluntary Manslaughter, an included offense of Count I: Murder, is defined by statute as follows:
'A person who knowingly . . . kills another human being while acting under sudden heat, commits Voluntary Manslaughter, a

The instruction at one point suggested to the jury that sudden heat was an element of the crime of voluntary manslaughter. At another point, it cited the voluntary manslaughter statute and informed the jury that the sudden heat was a mitigating factor. Although inartfully drafted and, in fact, technically erroneous, the instruction does not constitute fundamental error because it did not deprive the defendant of his due process rights.

587 N.E.2d at 101.

Although we agree with Wilcoxen that the jury was never explicitly instructed that sudden heat is a *mitigating factor*, it was instructed at three times that sudden heat reduces the offense of murder to voluntary manslaughter. The instructions given to Wilcoxen's jury more closely resemble those given in *Clark*, *Isom* and *Bane* than that given in *Palmer*. Accordingly, although the inclusion of sudden heat as an element of the offense was erroneous, when read as a whole with the other instructions and with the references to sudden heat describing it as a factor which could reduce murder to manslaughter, the instruction does not constitute fundamental error.

### C. Ineffective Assistance of Counsel

Wilcoxen claims that his trial counsel was ineffective for tendering the voluntary manslaughter instruction which erroneously included sudden heat as an element of the offense. He also claims that his appellate counsel was ineffective for failing to raise the erroneous instruction and trial counsel's ineffective assistance as issues in his direct appeal. We disagree with both contentions.

■ We analyze claims of both ineffective assistance of trial counsel and ineffective assistance of appellate counsel according to the two-part test announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Johnson v. State*, 674 N.E.2d 180, 184 (Ind.Ct.App.1996), *trans. denied* (standard of review for claim of ineffective assistance of appellate counsel is identical to the standard for trial counsel). First, we require the petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Roche v. State*, 690 N.E.2d 1115, 1120 (Ind.1997). Second, we require the petitioner to show adverse prejudice as a result of the deficient performance, that is, that but for counsel's deficient performance, the result of the proceedings would have been different. *Taylor v. State*, 659 N.E.2d 1054, 1061 (Ind.Ct.App.1995), *trans. denied*. We will find prejudice when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unjust or unreliable. *Id.* It is not necessary to determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *Toan v. State*, 691 N.E.2d 477, 479 (Ind.Ct.App.1998).

■ There is a strong presumption that counsel rendered effective assistance and made all significant decisions in the exercise of reasonable professional judgment, and the burden falls on the petitioner to overcome that presumption. *Lee v. State*, 694 N.E.2d 719, 720 (Ind.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 554, 142 L.Ed.2d 461 (1998). A petitioner must show more than isolated poor strategy, bad tactics, a mistake, carelessness or inexperience; the defense as a whole must be inadequate. *Davis v. State*, 675 N.E.2d 1097, 1100 (Ind.1996).

■ If an instruction is not fundamentally erroneous, then counsel is not ineffective for failing to object at trial, or failing to raise the issue on appeal. *Moore v. State*, 649 N.E.2d 686, 690 (Ind.Ct.App.1995), *trans. denied*. Although in this case, it was trial counsel who tendered the erroneous instruction, we have concluded that the instruction did not constitute fundamental error. Accordingly, Wilcoxen did not receive ineffective assistance of counsel.

668 N.E.2d 1206, 1212 n. 1 (Ind.1996). The instructions in *Isom* and *Bane* were substantially similar. *See Isom*, 651 N.E.2d at 1152; *Bane*, 587 N.E.2d at 100.